Good morning, gentlemen. Good morning, Your Honor. Good morning, Your Honors. This is case number 19-20779, American Guarantee & Liability v. ACE American Insurance. I just have a couple of preliminary notes. I forgot with the usual stuff that we have read your briefs and record excerpts, but we appreciate record citations when those are available. The main two things I would ask you is that we'll please look up into your cameras, which is good. You're both doing that already. We're not allowing video or photos of this session any more than we would if we were in New Orleans. Please make sure your phones are muted if you or anyone in the background has some of it on. And then finally, we will give you each your first five minutes uninterrupted because of these unusual circumstances so that you can at least get a decent start. With that, we will start with Mr. Hacker for ACE. Thank you and good morning, Your Honors. May it please the Court, I am counsel for appellant ACE American Insurance Company. This appeal principally involves the purely legal question of whether two post-trial settlement demands satisfied the strict requirements of Stowers to trigger an insurer's duty to accept the demand and avoid a potential excess verdict. Texas courts strictly enforce Stowers requirements for essentially three reasons. First, the violation of the Stowers duty operates as a forfeiture, so it is disfavored like any other forfeiture in law. Second, settlement negotiations are inherently, quote, fluid and complex. They involve hard bargaining and many, quote, tactical considerations about whether, when, and how to respond to demands. And third, as a result, absent strict objective standards for triggering the duty, wasteful follow-on litigation becomes essentially inevitable in every case, as insurers demand to know what the insurer knew and why it acted as it did. An insurer in Texas has no duty to accept a settlement demand, no matter how good its terms, unless the amount is clearly within the policy limits and demands terms are both unambiguous and unconditional. Texas courts have routinely reversed verdicts and judgments in Stowers cases where those threshold requirements of demand were not satisfied. This court should do the same here. I will be referring to the two demands at issue in this appeal as the second and third demand because Eglick's claims originally involved another pretrial demand, but the court below held that Ace acted reasonably in rejecting that. So I will start now with the second demand, which was an oral high-low demand for $1.9 million at the low and $2 million at the high, quote, with costs. I'm going to focus on two problems with that second demand. The first is the with costs ambiguity, and the second is the complete absence of any release as required under Texas law. Starting with the with costs problem, that phrase made the demand ambiguous, both as to its amount and to whether, in fact, it was actually within Ace's policy limits. Everybody agrees that if the costs phrase referred to litigation expenses, i.e. deposition costs and expert witness fees, then it was outside Ace's limits. If, however, costs referred to filing fees, more traditional simple court costs, filing fees and that kind of thing, then it did fall within Ace's limits because it fell within the supplemental payments provision, but that was the ambiguity. First of all, a witness agreed, and this is the transcript to page 789. A witness has agreed that costs is susceptible to more than one meeting, as I'm sure the court recognizes. Contracts routinely cost shifting provisions routinely will include attorney's fees within the word costs. Statutes do the same. It's common enough for the word like costs to include attorney's fees, not always, but sometimes. And indeed, Ace, the key players in the negotiations, Gabe Adamo and Russell Smith, both actually thought that the with costs proviso referred to litigation costs. And that was consistent with the claim log, the pattern of negotiations to date where Ace had repeatedly been reporting internally that whatever the settlement was going to be, it had to encompass and cover the litigation expenses that the plaintiff had incurred, which makes perfect sense. A plaintiff counsel normally wouldn't settle a case without covering its own litigation expenses. And so Ace all along anticipated that that was going to be a part of the demand in the ultimate settlement. And so when the with costs proviso came in explicitly, they took it to mean exactly as they had always understood, which was that costs were going to include, the settlement was going to include the litigation expenses, which again, all agree are outside of Ace's coverage. Accordingly, given the stipulate, everybody agrees that Ace understood this, perhaps it was a misunderstanding, given what the other side intended, but didn't say. And under AGLIC's own standard, that the insurer has to actually misunderstand or be confused as to the terms, it clearly is an unsatisfactory Stowers offer here. Now, to be clear, that standard is incorrect. I'm just saying it's satisfied here. But no case under Texas law holds that the insurer's subjective misunderstanding is relevant. The question is whether the demand on its face leaves any ambiguity or potential confusion. That's certainly the case here. The second point I would make about the second demand is the fact that there is no release. A release, express release is required under repeated Texas cases, including Rogor, McDonald, Leaker. And there's no mention of any release in the second Stowers, so-called Stowers demand. Mr. Hacker, are you going to spend the next five minutes talking about the third demand? That was my intention, yes. Oh, well, okay. So I- I think the third demand is far more questionable as to its sufficiency under Stowers. I'm personally inclined to think that it was sufficient. Well, let me do my best to try to persuade you otherwise, Your Honor. And the first point about it is now AGLIC says it clearly was on behalf of the Braswell children. We submit there's some uncertainty as to which parties it was on behalf of. But I don't want to belabor that here because I think the bigger problem is that AGLIC's own position creates a conditionality problem. It makes the offer, the demand inherently conditional because the demand could not be accepted and the settlement could not be approved without court approval because of the presence of the minor children in the case. It is a categorical rule under Texas law that a Stowers demand is deficient where it includes any form of a condition. This court said it best. Judge Wisdom for this court in the Dannard case said that the prohibition on conditions in Stowers demands is a, quote, saving clause on the insurer's duty that exists because otherwise accepting the demand, quote, would not protect the insurer fully against any further expenditures. Well, I might ordinarily, I mean, I might well end up deferring to my colleague who was on the Texas Supreme Court. But I'm just wondering over the course of the past 70 years or whenever since whenever Stowers came in, how many hundreds and thousands of settlements have been made on behalf of bereaved parents and children. And this issue was never raised. It seems to me this is extraordinarily novel position to assume that Texas law would take. So if you go actually your 70 years reference is exactly right, Your Honor. That's where the Jones case comes in. Stowers was actually some 90 years ago. The Jones case 70 years ago held that that's the case to lead the watershed case, the case the Danner sites. That case is the case that's cited by all courts for the proposition that a condition is strictly prohibited on a Stowers demand. And in that case, the condition or two conditions, Your Honor. One of them was the fact that there is going to have to be judicial approval of a settlement because a minor was a plaintiff. That's the that that Jones case, the watershed case, the Fountainhead case is exactly this situation. And the other side of emphasize, Your Honor, has not cited any cases in those intervening 70 years, any reported decisions or for that matter, unpublished decisions involving a Stowers demand with a minor plaintiff. It's just they're not out there, Your Honor. And I don't know what's going on sort of under the. Have you ever been a party to a Stowers to a settlement in a situation like this? I have not. Your client just wondering, I can't speak for my client in all the cases it's involved in, but I can't emphasize that if it were true, Your Honor, that hundreds or thousands of cases were out there involving enforcement of Stowers demands. Well, I mean, for the reason that they suggest, which is that there is no basis for the court to assume there is inherent conflict between the parent and the children. There are a couple of cases. I think maybe the Jones is one of them where the parent, what daddy was trying to get a benefit at the expense of the kids. But there's no reason for any court to presume that there's going to be any fight about the allocation of the settlement here, for instance, or in general. With respect to and I think that's answered by the Ford Motor and Borden cases cited, I believe, in our reply brief, which say when there are when the guardian is asserting independent claims, the adult is asserting his or her own claims. Then there's at least the potential for a conflict. And so the court doesn't necessarily assume there's a conflict, but the potential for the conflict exists. And it's required under those circumstances that there be a guardian ad litem appointed to evaluate the settlement and determine independently whether it's in the child's best interest. And then you have. Now you're arguing counterfactually because there was no big GAL in this case. Well, because the settlement didn't get instituted. If Ace had accepted on behalf of eventually, of course, eventually. Okay, I see. All right. And there's sort of two sides to it, Your Honor. First of all, if Ace had accepted, there would have had to have been approval GAL and then court approval. And if there wasn't for whatever reason. I don't believe that. I just don't believe that. I don't believe that in every. I mean, again, I'll defer to my colleague who was on the Texas Supreme Court, but I do not believe that in every case where a parent is suing for her own loss, plus that of her children as next friend. There is not a guardian ad litem in every single one of those cases is there. I don't think there always is throughout the case, but the point is to evaluate a settlement. I believe that is required. But let me look at the other side of the coin, Your Honor, maybe the other end of the telescope. If there had not been a guardian ad litem here, if because somebody just decided there didn't need to be for some reason, that creates another problem for the insurer and the defendant, the insured, which is that later a child could say. In some cases, years afterwards could say there was supposed to have been a guardian ad litem. This settlement was not satisfactory, did not protect my independent interests. And for that reason, to reopen the judgment and then pursue and continue to have the defendant and the insurer exposed to liability. Okay, I understand your argument there. Let me move on to my other difficulty about this. Let's assume that the third demand complied with Stowers. Then your argument is whether the settlement was a reasonable settlement or not. And your argument, I believe, is that it would have been reasonable because the case would have inevitably been overturned on appeal. Right? That's basically right. If I can just make one quibble with the way Your Honor articulated it, it's that rejection of the settlement demand was reasonable. It may have been reasonable for an insurer to accept it, but the question is whether rejection was. I'm sorry. Obviously, you're right. Okay. But you didn't argue that issue in the district court. In fact, Judge Ellison might think he was sandbagged because you're arguing it up here. And I, first of all, having been on an appellate court for quite a while, have some doubts about the extent to which evidentiary errors, critical as these seem to be, are inevitably going to be grounds for granting a new trial and what happens after that. But even assuming you're right about that, I have a problem about preservation of error. And you rely on the Miraglia case and the Colonial Penn case, but I see those as different for a very critical reason. It was your AGLIC that had the burden to prove that the settlement was unreasonable. In arguing, as you do, that the settlement was reasonable, you know what I mean. I understand. I'm sorry. Senior moment. In arguing your position, what you're saying is that AGLIC was basically required to fend off or to anticipate and rebut the possibility of appellate correction of these evidentiary errors in order to make its case. And I've never heard of the burden of proof depending on the anticipation of rebuttal. I guess the best I would say about that, Your Honor, is that it's part of their burden of establishing that the rulings were likely to, should have required the insurer to reassess its position, its valuation of the case. I think a better way, in my view, of putting the argument about the existence of preservation is that the issue in the case, the issue before the trial court at trial was, would a reasonable insurer have changed its valuation of the case in light of the three rulings? That issue, of course, was preserved. This is a different and arguably new argument in support of that position on appeal. But even if that's not sufficient to establish preservation, there's always the core principle that this court has discretion to consider an argument not weighed below. And I do think there's not the kind of sandbagging concern you mentioned, Your Honor, because we're not asking for an outright reversal on the basis of this as an entry of judgment. I think the appropriate outcome would be for this court to recognize that evaluating whether or not rulings like these, which to my mind were overwhelmingly, just inevitably likely to lead to reversal. But part of that, that's part of the Stowers inquiry, and then remand to the trial court to do the evaluation of all the facts and circumstances, including taking whatever perhaps expert evidence is necessary to evaluate that question and then account for those rulings. I'm sorry, but you've got three appellate judges here whose very job for many years has been to evaluate reversible error. I do not see why reversing remand to the trial court and reliance on experts would be better than our evaluation, which is essentially, you know, a legal balancing when you get down to it. Well, I completely agree these are core legal questions. First of all, whether Stowers requires the court to evaluate the rulings, and second of all, whether the rulings were correct or not, I think this court would be equipped to do that. It's just that the underlying question about whether it was reasonable under all the circumstances to reject the offer is a factual determination, and it would, in my mind, would be appropriate for the court to remand, for the court to conduct that analysis and take account of these clearly erroneous rulings in its factual determination as to whether or not it was reasonable for ACE under these circumstances to reject the third demand. I see my time has expired. If there's no further questions, I'll... You have an opportunity for rebuttal, and we're giving everybody a little extra time if need be at that point. Okay, Mr. Bowman. Thank you, Your Honors, and thank you for hearing this this morning. It's a privilege to be here. My name is Zach Bowman. I'm here on behalf of the Appellee American Guarantee and Liability Insurance Company. The facts of this case make it the perfect case for Stowers' liability. The original Stowers' opinion held that an insurer taking over the defense and settlement negotiations of a case ought to be held to that degree of care and diligence which an ordinarily prudent person would exercise in the management of his own business. And this requires the insurer to consider the likelihood and degree of its insurer's potential exposure to an excess judgment. That original Stowers' opinion also considered the relevance that it was the insurer's practice in that case to never settle for more than half of its policy limits. And we have a similar situation here. Just like the insurer in the original Stowers' case, ACE solely focused on its own exposure. They didn't take defense counsel's estimated 30% chance of success and multiply it by the estimated potential of exposure of 6 to 8 million. They only looked at their own exposure. They multiplied 30% by their own $2 million limits to get a valuation of $600,000. And that flawed valuation informed their settlement negotiations all the way through the underlying trial. And you'll notice every argument made by ACE during the trial and today on appeal attempts to ignore the record of what ACE did and what ACE knew. The adjusters, Gabriel Adamo and Robert Albin, who valued the case at $600,000, no longer worked at ACE at the time of trial, so the only witness to testify live was Vice President Russ Smith. He attempted to justify that $600,000 valuation, saying it had nothing to do with 30% times 2 million. It was arrived at independently. And the court rightfully found his testimony lacked credibility. And even now on appeal, ACE is arguing for consideration of chances of reversal of the underlying trial, something that not only isn't supported by the record of what ACE considered during the underlying trial in state court, but it wasn't even argued at this trial in Judge Ellison's court. And as Justice Willett stated in a concurrence to Mid-Continent when he was on the Texas Supreme Court, it's indisputable that case outcomes in these Stowers cases are often driven by unique factual circumstances. And therefore, the ultimate issue is whether the claimant's demand was reasonable under the circumstances such that an ordinarily prudent insurer would accept it. But Justice Willett's concurrence stated the facts matter greatly in these cases, and they certainly matter here. Now, of course, the threshold issue is whether the underlying plaintiffs, the surviving members of the Braswell family, triggered ACE's Stowers duties and the trial court correctly found they did on all three of those separate occasions. Now, opposing counsel did state correctly that in Roe v. Coeur, the Texas Supreme Court held that a settlement's terms have to be clear and undisputed. The Texas Supreme Court also stated in Garcia that the settlement offer has to present the insurer with a reasonable opportunity to prevent the excess judgment by settling within policy limits. And I think it's helpful to come back to the core crux of Stowers being an analysis of reasonableness. Was it reasonable for ACE to reject these offers? And it simply wasn't. ACE stretches in asserting that anything about these offers was unclear or disputed. With regards to the oral high law. Let me ask you, assuming that the argument was preserved on the reasonableness of the settlement in the light of the possibility of appellate reversal, I would like to hear what you say about that as a factor that we should consider, assuming that it was preserved. Assuming that it was preserved, I think those factors could be considered in the right case. But I don't think this is the right case because we don't have facts in the record that support ACE's consideration of whether it would get this case reversed on appeal. And let's not forget, when this case was on appeal, ACE settled this for $2 million. Ten. Ten. Ten overall. ACE contributed two. Well, of course, American Guarantee contributed nearly eight, 7.75. But once this case was on appeal, ACE offered up its policy limits. So it's a little surprising today that ACE is offering the argument that somehow it was justified in valuing the case under its policy limits because. My initial impression is that the district court more likely made an error, a reversible error than not. And. I think that that if it if the answer is, I mean, if the argument is preserved, it does. And I can't find any cases in Texas that have actually considered that argument, but it does sound that is a plausible reason to reject the settlement. If you feel like you have very strong arguments to reverse the whole thing. And I agree with you, Your Honor, if there are strong arguments in the record regarding chances of reversal on appeal, I could see a case arising where the court does need to consider the chances of reversal. But I just don't think we have that evidence here. But what what what what are the deficiencies? Well, one of the deficiencies is we don't have the underlying trial court record. So we don't have evidence that these objections were properly preserved or raised. Now, come on. They argue that they're officers of the court. You've got to accept that. Well, these were errors, except that all the contemporary emails say, oh, my gosh, look what the judge did. Isn't that reversible? I mean, cut it out. Well, I just want to be honest about what's in the record, Your Honor. Ace presented. That's not in the record, but we know the whole briefing has been conducted on the basis that there were these trial errors and that everybody, even you, I would assume, would think that that excluding whether the the truck was legally parked or not was was a big mistake on the part. Now, whether it was reversible error, it's another matter. But it was a mistake. And I think that's the debate, Your Honor, is is it reversible error or not? And it's not a slam dunk issue of reversible error. Judge Sandhill and the underlying trial court excluded that evidence. And there's an email reflecting this, that he believed it was the jury's job to find out whether there was negligence or not. He didn't want the issuance of a citation to prejudice the jury's determination. I think that's an argument that could be upheld on appeal. I don't think it's a slam dunk issue of reversal, and we don't have evidence in the record to support that it's a guaranteed point of reversal. What about the double hearsay? Your Honor, I dispute that that's even double hearsay. Let's let's talk about what that issue actually was. Tyler Renner was an employee of Brickman who told Michelle Braswell, the surviving wife, that he had seen the truck that caused the accident do a U-turn and then pass Mark Braswell on his bicycle. That issue itself is something that he saw and that he relayed to Michelle. It wasn't an issue of double hearsay. What is disputed is Mr. Renner then telling Michelle that he believed the truck stopped short based on what he heard from other employees. That was the issue of double hearsay. But the facts supporting that this truck stopped short was not a double hearsay issue. And we know that there's exceptions to the hearsay issue here for party opponent statements. Tyler Renner was also available to testify live at trial. I haven't quite fully grasped this short stop so-called theory. Exactly what does that mean? Sure, Your Honor. There were a few different theories of liability here. And Richard Mitoff, the plaintiff's lawyer, was able to artfully switch between those at trial and give the jury the option. One was the stop short theory, which was that Mark Braswell collided into the back of that truck because it parked in front of him quickly. It stopped short, and he didn't have time to react. Was there other evidence that was fairly supported that it had been stopped for four or five minutes at the time the accident occurred? It was not, Your Honor. The evidence is actually disputed in the record, and that's something that Richard Mitoff— A very surprising dispute that he either stopped momentarily or he'd been there for five minutes. I mean, there's a wide disparity in the facts there of what actually happened. I mean— There is a— How that creeped into the record. Yes, the record reflects that even the Brickman employees disputed how long the truck had been parked, and Richard Mitoff was able to expose that at trial. Some said it was—one said it was less than a minute. Another said it was four or five minutes. You even had mock jurors when the defense counsel was testing out its theories of liability in this case. There were mock jurors saying the truck must have stopped short. I can't see how he would have collided with that truck in any other instance. So there were jurors coming up with that theory even on their own, and there were disputed facts about how long that truck had been parked, and the experts disagreed on how much time Mr. Braswell had to react based on where the impact was to his helmet. So there were disputed facts in the record as to whether it stopped short or not. What was the evidence that he had stopped short? Where did that evidence actually come from? What witness and under what circumstances was that testimony received? The evidence came from Tyler Renner, Your Honor, who was a Breckman employee, who in the record— Did he testify? He did testify, Your Honor. Oh, he did? And he also spoke to the police. So his statements came in through Michelle Braswell. They came in through a police record of his statement. So Renner actually testified that facts that supported the immediate stop of the truck caused the accident? Yes, Your Honor. He disputed some of his—his statement to Michelle Braswell was somewhat different than the statement that he offered in court, and I think he was not looked at as a credible witness. There was even an issue where defense counsel asserted attorney-client privilege before he could respond to something that I believe arose a suspicion with the jury. So there were a lot of questions here about who was telling the truth. His testimony—Renner's testimony was different from that that he told the family member. Yes, it was different than what he told the family member. Correct, Your Honor. What was his testimony on the witness stand? On the witness stand, Your Honor, I believe he spoke to what was in the police report, that he saw the truck turn around, but he saw it pass a bicyclist. He wasn't sure exactly what cyclist it was. And did he deny what he had told Ms. Braswell? Yes, he did, Your Honor. And I believe the jury may have not found that credible given the underlying facts of the case. Ms. Braswell testified that he did, in fact, say that. Is that correct? Correct. So it was a disputed fact of trial, Your Honor. Mr. Bowman, this question may sound somewhat metaphysical, but can you help us understand the line between whether the stower's duty is triggered versus whether the stower's duty, once triggered, is satisfied? Yes, and I think that line, which can be a fine line, because I think you consider the unique facts and circumstances of the case for both inquiries. But that first line is really about whether the demand gives the insurer a reasonable opportunity to settle within policy limits. That's the language from Garcia. The next prong is then to determine whether the insurer was reasonable in rejecting that opportunity. And so we look at the first prong. In this case, it was a summary judgment issue. The settlement demands on their face were unconditional. They proposed to release all claims on behalf of all plaintiffs. Nothing that Mr. Hacker has argued today has been discussed by any court looking at these stowers issues. The conditions of the minors has never been discussed as a condition. In fact, the Garcia case had a guardian, and the Roquefort case had minors, and these issues simply weren't looked at. These aren't the kind of conditional cases that have justified courts finding the demands were ineffective. The Texas Supreme Court in Maldonado looked at the fact that the offer was above policy limits and required the insured's contribution, and the insurer was unaware of whether the insured would contribute or not. In Webster out of the Houston Court of Appeals, the offer was conditioned on there being no other insurance, and there was other insurance. In Jones, there was a third-party intervener who was subrogated who had a 50% interest in the recovery and had to approve any settlement, and there was nothing in the record as to whether he approved. So those are the kind of conditions that really destroy an insurer's power of acceptance, and that's not what we have here. We also don't have a situation where the insurer was exposed to any further risk of liability, as this court looked at in Danner and the Texas Supreme Court looked at in Bleeker. In Bleeker, it was an offer that failed to release a known hospital lien and the fact that that lien still would have been out there even after the settlement. So the way that courts have looked at conditions are sort of two-pronged. Did the offer prevent the insurer from actually accepting it because of some other condition? We don't have that here. And did the offer expose the insurer to a risk of further liability? We don't have that here either. So as far as whether it triggered Stowers' duties, the trial court correctly affirmed that they did, all three of them did, but that it was only the two after trial that Ace acted unreasonably in rejecting because of how poorly trial had gone for Ace. And we do look at the unique facts and circumstances of the record. I won't dispute that the right case can come up where we do look at chances of reversal on appeal. If there is a legal issue that looks like it was clearly wrong that the defendant had a chance of getting reversed and that was an issue that was documented in the record as a consideration, then I could see that being the right kind of case, but we just don't have that here. In fact, Russ Smith, again, the vice president of Ace who testified and that the court found lacked credibility, was specifically asked regarding the issues of reversible error, was this a factor for your evaluation of the case? And he answered, the factor being that this evidence wasn't allowed, yes, sir. No, it was not a factor. And that appears in the record at 7746 and 47. It's quoted directly in our brief at pages 52 and 53. So a record could certainly come before this court where it's documented and supports consideration of chances of reversal on appeal. But even if we get past waiver and even if we get past the fact that these aren't slam dunk evidentiary rulings that are going to be reversed, we still have contradicting facts in their testimony. They had the opportunity to try to present testimony on considering those chances of reversal as justifying rejection, and they simply aren't in the record. They had an expert testify. He didn't testify about chances of reversal. He did his own independent evaluation of the case, and the court didn't deal with his testimony at all because it didn't consider it relevant. Mr. Bowman, you seem to argue throughout your briefing that Ace bore some duty to clarify the Braswells' offers with the Braswells. And I'm having trouble finding support for that position in Texas law. What is your best sort of on-point precedent for the notion that Ace had some duty to clarify the Braswells' offers? We don't say they have a duty to clarify, and I know it's been couched in those terms. I think we do consider whether they considered these issues a lack of clarity in the record. It's not just positive, but we do need to consider that. And this court looked at that in the Generali opinion back in 2000, and it recognized that there's going to be some degree of common understanding required in settlement negotiations. A lot of these settlement negotiations are going to be quick and hurried. In fact, it was Ace that invited high-low negotiations to occur throughout trial, and Richard Middolf responded by continuing to negotiate in that fashion. So whether they raise these issues or ask for clarification, it's not just positive, but it is important to consider in the record that we have before this court. And this court's already done that in the Generali opinion when it looked at an insurer that was alleging there were conditions that raised issues of concern regarding whether an annuity was going to expose it to any further liability down the road. This court said there's nothing in the record supporting that there was any consideration of these issues. So I think we can look at the record here and the fact that Ace responded to each of these demands with counteroffers as to dollar amounts, and it wasn't evidencing any consideration of these issues. So we think that the demands, even just looking at their face, survive and are unconditional and sufficiently trigger stowers. But that determination is just bolstered by the fact that Ace never considered any problems or issues with these demands. They simply were negotiating over dollar amounts. We do believe that Ace did waive its argument regarding the chances of reversal on appeal. I know we sort of jumped into considering the objections themselves. But as we know, on appeal, there's never a guaranteed chance of reversal, especially when you're dealing with evidentiary objections. Not letting in the evidence of citation is debatable because it could have been prejudicial to the jury. With regards to what supported the hearsay exceptions, we don't have the full record before us, but we know that the court let that in and it let Tyler Renner testify. And there's even evidence in the record that this court was mainly concerned with attempting to get to the truth of this matter. What is the standard of proof that is required to be shown to successfully argue that the possibility of appellate reversal is a basis to deny the offer? You would have to show that it was preserved first, Your Honor, and then you would have to show a probable prejudice by allowing or not allowing that evidence in. I mean, by what standard of proof? In other words, just by a preponderance of the evidence that one would conclude that the district court would be reversed? Are they saying in this case that the underlying court would have been reversed? I think you'd have to show clear error, Your Honor, that the evidence was not allowed in and that it was prejudicial. I believe it's a probable prejudicial standard as to whether it prejudiced the jury or not. And even that, I mean, clearly it wouldn't be prejudicial. I mean, it seems to me there'd be very little question about that. I think there's even some gray areas in that, Your Honor, because on the issue of there being no citation, the police officer was asked, did you issue citation in this case? The officer said no, and then there was an objection. So there's emails in the record reflecting that the jury heard that there was no citation issued. So the prejudice is even debatable in this case. But I guess I want to emphasize to round out my closing here that there could be the right case where there's these points of reversal that cannot be ignored and that have to be considered as to what the court of appeals would have done. Unfortunately, those arguments weren't made in the trial court below, and I wish Judge Ellison could have considered those arguments. It would have made it a very different trial than the one that we had. But that evidence wasn't there. So you're willing to reverse and revand? Is that why you say so he can consider them? No, Your Honor, I just don't like getting sandbagged, as you said, with an argument for the first time on appeal that wasn't in the record. We spent a week at this bench trial debating the reasonableness of rejecting these demands, and Judge Ellison heard a lot of testimony. He even got 50-page submissions of findings of fact and conclusions of law from both parties three months later, and this argument was never made. And it's because it's not supported by the record. Ace never considered the chances of reversal when it rejected these offers. There's nothing in the record to support that. And, in fact, when it was on appeal, Ace settled it. It put up its policy limits. It even referred to American Guarantee's contribution as an extreme discount and agreed that it wouldn't take issue with the reasonableness of that contribution. And that's in the record at 6614. The only thing that strikes me in response to what you're saying about Ace settling for policy limits is that your company settled for a considerable discount over the jury award, which indicates that your company was willing to believe, at least, or negotiated within the idea that this jury award would not be sustained. I think there were debatable points that would be raised on appeal, but I think the dollar amounts that each insurer contributed is evidence of the fact that those were not guaranteed points of reversal. They would certainly be debated, but the discount is solely a reflection of the fact that we never know what's going to happen on appeal. But we do know that Brickman had suffered a $27 million judgment, and paying some significant portion of that to settle it was going to be in both insurers' best interest, regardless of what the evidentiary points on appeal were. So the case had value, and that's why both insurers decided to settle it. There's just not evidence in the record to support Ace's argument on this issue. Okay, thank you very much. Thank you very much, Your Honors. We'll go back to Mr. Hacker for rebuttal. Thank you, Your Honors. I'll go straight to the question of the third demand with respect to the conditionality created by the child's interests. Either way, Your Honors, the demand is conditional. Clark v. McFerrin and Bourdain v. Martinez, both cited in our reply brief, are unambiguous. They say that when there is the adult, the guardian has her own claims alongside the minors, the court at least has the discretion to appoint a guardian ad litem. And so it's not – there's no way Ace could have known, a reasonable insurer would know, when the demand is made, whether or not a guardian would be appointed and would approve, rendering a clear condition. If they didn't approve, then you have the problem identified in Missouri-Texas Railroad v. Pluto, where a judgment was unwound 17 years after it was entered at the motion of the then minor who complained that she had not been represented by a guardian ad litem. Either way, there is a risk of continuing exposure of liability, which is exactly why that creates the – exactly why Texas law created the saving clause, which prohibits that kind of continued exposure, that kind of condition on an enforceable STOWERS demand. It is not unusual, Your Honors, for an area of law to be sort of screened off from STOWERS. Class actions cannot be settled – STOWERS does not apply to class actions in Texas because class actions, too, have to be approved by a court. So it wouldn't be unusual to say, as the Jones case said, you cannot – 70 years ago, you cannot apply STOWERS to a demand that includes – inherently includes the condition of court approval for a minor. Counsel mentions that in Jones there was an intervener interest who had to be approved. He ignores the fact that there was a minor's interest that also had to be approved, and that's what the court said made it conditional. Jones is the fountainhead case. If there was a common thing in Texas, hundreds or thousands of cases, counsel would be able to cite even one case involving this kind of enforcement of a STOWERS demand involving a child. He cites the Roe Corps case. But in that case, there were separate demands. And indeed, whether or not it was – the demand encompassed both or separately was part of the confusion in the case. So I think that case, if anything, shows the complications in the STOWERS context created by the existence of a minor with claims independent of an adult. In any event, Jones answers it. And if it doesn't, we submit that it would be appropriate to certify a question to the Texas Supreme Court. However, if applying Texas law, which is very clear on two straightforward points, doesn't satisfy this court of the answer, then the Texas Supreme Court can apply the answer. But the two settled principles, as I say, are already settled. You cannot have a conditional of STOWERS demand. That's absolutely categorical. And when a child has – when there's a minor interest in the case, when a minor has a claim, that is going to be – any settlement, any demand is going to be conditional. You put those two settled propositions of Texas law together, and you get the principle that here this demand was a deficient STOWERS demand. And again, the Texas Supreme Court can clarify if need be. Judge, will you ask the question about whether Ace had sought clarification and Mr. Bowman responded to all the real issues, whether Ace even considered the problem and cited the Generali case? Well, it's quite clear that Generali, if anything, supports our position. As we know, Generali is unpublished. It doesn't control by its own terms. But in Generali, the court recognized the central proposition that you cannot have a conditional STOWERS demand. That was the rule applied in Generali, and what the court held – and it cited Banner and it cited Jones. And what the court held in applying that rule was that the offer, the demand in that case, was not conditional because, as the court said, no reasonable attorney would construe a structured settlement, which was the proposal in that case, would construe a structured settlement as potentially leaving the insurer liable for anything. I mean, Mr. Hacker, so you're saying that it is not possible for a family to assert a STOWERS demand because the insurer is never unreasonable for failing to settle within policy limits? Well, it's not possible in a personal injury case where the adult is asserting claims and the minor is asserting separate claims and they're potentially in conflict. That's what most of them – I mean, you know that. I mean, you know. Your Honor, I don't know that STOWERS has been applied in those circumstances. Certainly those cases arise, but the issue isn't whether you can have a settlement in those cases. Of course you can have a settlement in those cases. They settle all the time. The issue is whether or not the insurer subjects itself to this tort duty, strictly enforced tort duty, despite the risk, the unambiguous risk of future liability when it declines to agree to a demand that includes a minor claim because of the condition that it has to be approved. Either the guardian has to approve it or a court approves it. That makes for a condition that makes it unenforceable under STOWERS. If I can just say one more word about the reasonableness of rejecting the demand on the facts here and the three errors, the three trial rulings that supposedly changed the circumstances and the landscape for ACE. We talked about, and the court has talked about, the double hearsay ruling and the parking citation issue. I think probably the biggest issue is the one that Richard Mitup identified, which is the admission of medical evidence, the testimony that Mary Braswell had suffered the trauma and particular types of mental injury from the loss of her father. No doubt that she was a traumatic injury, but that would be true in essentially any case. And I have literally, in my years of practice, never anywhere heard of a trial with a claim like that where there was not medical testimony explaining the basis and the extent of the injury and connecting the asserted claims of damage and loss to the actual incident as opposed to the myriad kinds of other things that can create depression and other emotional difficulties in a young girl. Absent that, and then Mr. Mitoff said, and Eglick's own trial witness said, that was devastatingly prejudicial. Although it went to her damages, everybody below agreed that the fact of that kind of emotional testimony could sway a jury to try to provide money and find liability where otherwise wouldn't. And there's no defense of the admission of that evidence. Unless there are no further questions, I thank you for your time. Thank you very much. Appreciate it. We'll take the case under advisement. Thank you, Your Honors. Thank you. Thank you, Your Honors.